**Mary NEWELL, Plaintiff,**

v.

**CELADON SECURITY SERVICES, INC., Keith Green, Rodney Butler, and Abedekader Kouidri, Defendants.**

**No. CIV.A. 04–10429–JGD.**

United States District Court, D. Massachusetts.

Jan. 17, 2006.

Edward Kutchin, Kerry R. Northup, Kutchin & Rufo, PC, Boston, MA, for Celadon Security Services, Inc., Defendant.

Richard A. Mulheam, Law Offices of Richard A. Mulheam, Worcester, MA, for Mary Newell, Plaintiff.

### MEMORANDUM OF DECISION AND ORDER ON CELADON'S MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, Mary Newell ("Newell"), was employed by the defendant, Celadon Security Services, Inc. ("Celadon"), as a security guard from December 11, 2000 until May 18, 2001. She contends that on May 5, 2001 she was sexually harassed by a co-worker, and that, after she complained, the company retaliated against her by, among other things, giving her an unfavorable assignment. Newell brought this action alleging that Celadon[1] is liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. for sexual harassment and discrimination (Count I) and retaliation (Count II), as well as for sexual harassment and discrimination (Count III) and retaliation (Count IV) under state law, Massachusetts General Laws ch. 151B. This matter is presently before the court on "Defendant Celadon Security Services, Inc.'s Motion for Summary Judgment on Claims by Plaintiff Mary Newell" (Docket No. 30). For the reasons detailed herein, the motion is ALLOWED.

### II. STATEMENT OF FACTS[2]

Celadon is in the business of providing security services to various clients, primarily by providing uniformed security officers at the client's facilities. Zuchowski Aff. ¶ 2. Newell was employed by Celadon as a security guard from December 2000 until May 18, 2001. Zuchowski Aff. ¶ 4; PF ¶ 1. Her immediate supervisor was the defendant Rodney Butler, who gave her work assignments. PF ¶ 2. However, he did not work with her at her specific assignments. PF ¶ 2.

---

1. The claims against the other defendants, who are employees and/or former employees of Celadon, are not at issue here. Rodney Butler and Keith Green have never responded to the complaint. The defendant Abedekader Kouidri has never been served.

2. The facts are derived from the Affidavit of Steven Zuchowski ("Zuchowski Aff."), Vice President of Celadon, and related exhibits ("Def.Ex."), all of which are attached to Docket No. 30, and Plaintiff's Statement of Material Facts of Record As To Which There Exists a Genuine Issue to be Tried ("PF") and related exhibits ("Pl.Ex.") which have been filed as Docket No. 33.

The defendant, Abedekader Kouidri ("Kouidri"), was another employee of Celadon who worked as a security officer. Zuchowski Aff. ¶ 5. At no time did Kouidri have any supervisory authority with respect to any other employee of Celadon, including Newell. Zuchowski Aff. ¶ 6. As detailed *infra*, however, Newell contends that she thought that he was a supervisor. Prior to the incident which forms the basis of the instant litigation, Celadon had never received any complaints about Kouidri from any other employee or client alleging sexual harassment or any other type of discriminatory conduct. Zuchowski Aff. ¶ 7.

As of May, 2001, Celadon had at least 150 security officers and provided security to over 30 separate facilities. Zuchowski Aff. ¶ 9. The security officers were routinely transferred to different facilities. *See* Zuchowski Aff. ¶ 10; Def. Ex. C. At the start of her employment with Celadon, Newell was given written "Employment Terms & Conditions" which expressly stated that "I also understand that I am not assigned to any one particular site and at the companies' [sic] discretion may be moved at any time." Def. Ex. I. During her employment with Celadon, Newell worked at approximately a dozen locations. Def. Ex. C. Celadon security officers were required to wear uniforms when they were on duty, while certain supervisors were required to wear suits. Zuchowski Aff. ¶ 8. As security officers, Newell and Kouidri were required to wear uniforms during their shifts. *See id.*

Celadon provides all new employees with written employment policies, which are included in a document entitled "Celadon Employment Terms & Conditions." Zuchowski Aff. ¶ 3. This document includes Celadon's policies prohibiting discrimination. Zuchowski Aff. ¶ 3; Def. Ex. I.

### Events of May 5, 2001

On May 5, 2001, Newell and Kouidri were working at One Kendall Square. PF ¶ 3. Newell worked two shifts that day, and she describes the relevant event as follows:

> During the second shift, I was asked by the older security guard on the site to accompany Kouidri on a tour of the building so that I would know what to do in case I had to work alone. During this tour, Kouidri brought me to the basement in a poorly lit area. Kouidri grabbed my breast. I pushed him away. He then pushed me against the wall and kissed me.

Pl.Ex. A ¶ 6; PF ¶ 3. Apparently, the rest of the shift was uneventful. Newell reported the incident to Celadon two days later, on May 7, 2001.[3] PF ¶ 6.

Newell does not dispute that Kouidri was not actually a supervisor. However, she contends that she believed he was a supervisor because he was in "street clothes," not in uniform, on May 5, 2001, as well as on the one previous occasion she had seen him, and because he had a walkie-talkie. PF ¶¶ 4–5. According to Newell, Kouidri's street clothes were a sweater and pants, not a suit. Def. Ex. B (Newell Deposition) at 137–38.

Newell admits that she never asked whether Kouidri was her supervisor, and he never said that he was a supervisor. *Id.* at 85. Newell does not contend that, on the day of the incident, Kouidri purported to exert any supervisory authority

---

3. There is some confusion about the dates, although the court does not find them significant. The Massachusetts Commission Against Discrimination ("MCAD") concluded that the incident occurred on April 29, 2001, and that it was reported by Newell to her supervisor on May 5, 2001. *See* Def. Ex. G. The dates used herein are taken from the plaintiff's statement of facts.

over her. On the one earlier occasion that she had seen him, Kouidri was walking around a construction site and she was located at a desk. *Id.* at 80–81. When he passed her, Kouidri allegedly yelled at her and ordered her to return to her desk when she left her desk to get a soda. *Id.;* PF ¶ 5. Additionally, he was very pushy. PF ¶ 5. According to Newell, however, when Kouidri suggested that she change her location, she simply disregarded the suggestion. *See* Def. Ex. B at 88–89.

### Celadon's Response to Newell's Complaint

Newell completed her shift on May 5, 2001 and worked at the same facility on May 6, 2001 (Sunday) and May 7, 2001 (Monday). Def. Ex. C. On May 7, 2001 she reported the incident to a supervisor Frank Doran, and her immediate supervisor Rodney Butler was also notified. PF ¶ 6; Def. Ex. E (Butler Aff.) ¶ 7. At the time of the report, according to Celadon, Kouidri was on vacation, and he voluntarily resigned at the end of the vacation without responding to Celadon's request to discuss the incident. Def. Ex. E ¶ 8.[4] Celadon contends that it tried to discuss the incident with Newell, but that she failed to respond to various calls, which Newell denies. *See* PF ¶ 25.

It is undisputed that Newell was assigned to work at Marina Bay in Quincy, a first class condominium complex, beginning on Tuesday, May 8, 2001, through Friday, May 11, 2001. *See* PF ¶¶ 7, 9.

Newell had worked there previously, on May 3, 2001, as well. Def. Ex. C. It also is undisputed that her shift was 5:00 p.m. to 12:00 a.m. (midnight) Tuesday through Thursday. PF ¶ 9. Marina Bay was difficult to get to by public transportation, and impossible to get home from, and Newell did not have a car. PF ¶¶ 7–8. Consequently, "Rodney Butler arranged for another supervisor, Defendant Keith Green, to pick Plaintiff up at the end of the shift at Marina Bay to take her home to Dorchester." PF ¶ 8. Mr. Green picked Newell up at approximately 11:30 p.m. Tuesday through Thursday, May 8 –10, 2001, without incident, and drove her home. PF ¶ 9. Celadon contends that, consistent with the Friday and Saturday night shifts at Marina Bay, Newell's shift on Friday, May 11, 2001 was to end at 1:00 a.m., not midnight. Zuchowski Aff. ¶ 13. Newell contends that her shift was to end at midnight, that she waited for Mr. Green until 12:45 a.m. and that when he failed to pick her up she started to walk home. PF ¶ 11. According to Newell, the phone at Marina Bay did not work. PF ¶ 11. Although it was a residential complex, Newell apparently did not ask to use anyone's phone, but rather started to walk home from Quincy to Dorchester. The walk home was very frightening, and eventually Newell made her way to a nursing home where she called a friend and made arrangements to get home. PF ¶ 12.

Newell claims that she does not know the reason for her transfer to another site

---

4. Newell contends that the record is unclear as to whether Kouidri was actually on vacation following the incident, and that Celadon had previously taken the position that Kouidri had "removed himself from the work schedule" prior to Newell's complaint. PF ¶ 22. Newell also contends that since Kouidri signed a separation form on November 21, 2001, Celadon had the opportunity to discuss the incident with him. PF ¶ 23. This court finds no material inconsistencies in Celadon's facts. The record is undisputed that Kouidri did not return to work following the incident report, for whatever reason. Moreover, Celadon has consistently asserted that "instead of returning from vacation, [Kouidri] picked up his last paycheck and resigned from Celadon." Def. Ex. E ¶ 8. Upon his resignation, Kouidri was given a "poor" reference and it was noted on his separation form that he was not eligible for rehire. Pl.Ex. F.

following her complaint. PF ¶ 14. Newell asserts, and Celadon disputes, that the transfer to Marina Bay was "disadvantageous to her" in that it was inaccessible by public transportation, Newell worked alone and had no operable phone, and there were no double shifts available for extra money. PF ¶ 13. According to Newell, she was paid $8.50 per hour at Celadon, except for training, but she only received $6.50/hour at Marina Bay. PF ¶ 16. However, Newell's payroll records establish that she was paid $8.50/hour at Marina Bay too. *See* Def. Reply Mem. (Docket No. 36) Ex. A.

On Friday, May 18, 2001, Newell went to Celadon and resigned. Zuchowski Aff. ¶ 14. She signed a Separation Form confirming that she had "no claims against Celadon or any of its employees." Def. Ex. F. Nevertheless, Newell filed a complaint with the MCAD. The Commission was "unable to conclude that the information obtained establishes a violation of the [discrimination] statutes" and dismissed the complaint on September 16, 2003. Def. Ex. G. Newell commenced the instant litigation on March 1, 2004.

Newell asserts that she was very traumatized by her experiences at Celadon, suffered a severe deterioration in her mental health condition and had to be hospitalized. PF ¶¶ 15. Newell has suffered from a major mental illness since she was approximately 16 years old. Pl.Ex. B. As a result of the events at Celadon, Newell contends that she was unable to maintain regular employment for approximately one year. PF ¶ 16.

Additional facts will be provided below where appropriate.

## III. ANALYSIS

### A. *Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant ... would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at ·2553. In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy,* 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted). "Moreover, summary judgment may be appropriate even in cases where elusive concepts such as motive or intent are at issue, if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 535 (1st Cir.1996) (internal punctuation and citations omitted). Finally, Federal Rule of Civil Procedure 56(c) requires that summary judgment be entered "against a par-

ty who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

Applying these principles to the instant case requires that summary judgment be entered in favor of Celadon.

### B. *Celadon's Liability for Sexual Harassment by Kouidri*

Newell's claims are based on the alleged sexual harassment perpetrated against her by her co-worker, Kouidri. Sexual harassment is unlawful under both federal and state law. Thus, Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. at 2405 (internal punctuation and citation omitted). Similarly, Mass. Gen. Laws ch. 151B, § 4(16A) makes it unlawful "for an employer, personally or through its agents, to sexually harass any employee." Like its federal counterpart, sexual harassment under ch. 151B includes "physical conduct of a sexual nature" which has "the purpose or effect of unrea-

sonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Mass. Gen. Laws ch. 151B, § 1(18). For purposes of the instant motion for summary judgment only, Celadon does not dispute that Kouidri's conduct created an actionable hostile work environment.

■ The applicable standards for assessing an employer's liability for its employee's conduct depend upon whether the offending employee is a supervisor or simply a co-worker. Where the offending employee is a supervisor, the federal and state law differ. Under federal law, an employer is vicariously liable when a supervisor creates a hostile work environment, subject, however, to a possible affirmative defense, commonly known as the *Faragher/Ellerth* defense, based on the relevant Supreme Court cases.[5] The *Faragher/Ellerth* defense, which is available in the absence of a tangible adverse job action, "consists of two elements which, if proven, permit the employer to avoid liability. First, the employer must show that it exercised reasonable care to prevent and correct promptly the harassment. Second, the employer must show that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Noviello v. City of Boston*, 398 F.3d 76, 94–95 (1st Cir.2005) (internal punctuation and citations omitted). Under Massachusetts law, however, employers are "strictly liable for supervisory harassment" so the *Faragher/Ellerth* defense is not available. *Id.* at 95 (citing *College–Town, Div. of Interco, Inc. v. MCAD*, 400 Mass. 156, 162–69, 508 N.E.2d 587, 591–94 (1987)).

---

**5.** *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ When co-workers, rather than supervisors, are the perpetrators of sexual harassment, both Title VII and Mass. Gen. Laws ch. 151B apply the same standard in assessing employer liability. In such circumstances, "an employer can only be liable if the harassment is causally connected to some negligence on the employer's part. Typically, [under federal law] this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it. Similarly, under [C]hapter 151B, employer liability for coworker harassment requires a showing that the employer knew or should have known about the harassment, yet failed to halt it." *Noviello*, 398 F.3d at 95 (internal citations omitted).

This court concludes that Kouidri cannot be deemed to be a supervisor, and, consequently, Celadon is not liable under a theory of strict liability. The record also fails to establish that Celadon is liable under the lesser standard applied to co-worker harassment.

### 1. *Kouidri's Status—Co-employee or Supervisor*

■ "The key to determining supervisory status is the degree of authority possessed by the putative supervisor. Thus, courts must distinguish employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." *Noviello*, 398 F.3d at 95 (internal quotation and citations omitted). The First Circuit, considering "both common law agency principles and

the purposes of the anti-discrimination and anti-retaliation laws" has determined that "the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment," with such authority consisting primarily "of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Id.* at 96 (internal quotation and citations omitted). "Without some modicum of this authority, a harasser cannot qualify as a supervisor for purposes of imputing vicarious liability to the employer in a Title VII case, but, rather, should be regarded as an ordinary coworker." *Id.* The same standard is applicable under Massachusetts state law. *Id.* See also MCAD Sexual Harassment In The Workplace Guidelines § IIIB (2002) ("*MCAD Guidelines*").[6]

■ Strict liability of the employer for the actions of its supervisors is premised on the legislative conclusion that an employer should "be liable for discrimination committed by those on whom it confers authority." *College–Town*, 400 Mass. at 165, 508 N.E.2d at 593. Thus, where an employer has conferred supervisory authority on an employee, regardless of the actual title given the employee, there may be strict liability on the part of the employer even if the supervisor is not the victim's direct supervisor. *See Morehouse v. Berkshire Gas Co.*, 989 F.Supp. 54, 64 (D.Mass.1997); *Messina v. Araserve, Inc.*, 906 F.Supp. 34, 37 (D.Mass.1995). This is consistent with the reality that "[a]lthough coworkers or even outsiders may be capable of creating a sexually harassing work environment, it is the authority conferred

**6.** The Guidelines identify the factors the MCAD "will consider as indications of supervisory authority" as including "undertaking or recommending tangible employment decisions affecting an employee; [d]irecting activities, assigning work and controlling work flow; [h]iring, firing, promoting, demoting or disciplining; [a]ltering or affecting an employee's compensation or benefits; [e]valuating an employee's work load; [d]istributing necessary supplies and tools; [g]iving directions and verifying and fixing mistakes; [a]ssisting employees in assigning tasks; and [m]onitoring and evaluating work performance." *MCAD Guidelines* § IIIB.

upon a supervisor by the employer that makes the supervisor particularly able to force subordinates to submit to sexual harassment." *College–Town,* 400 Mass. at 166, 508 N.E.2d at 593.

In the instant case, the record is clear that Celadon did not grant Kouidri any supervisory authority over any other employees, including Newell. Without belaboring the point, Kouidri had no authority to take any steps which would affect the terms or conditions of any co-employee's employment. Consequently, there is no strict liability on the basis that Kouidri was a supervisor as a matter of fact.

■ Newell argues, however, that the inquiry does not end here. Rather, she contends that she believed that Kouidri was a supervisor which raises a genuine issue of material fact whether Kouidri should be treated as a supervisor based on a theory of apparent authority. This court finds, however, that Newell has not established that Kouidri was purporting to exert supervisory authority over Newell when he engaged in the actionable conduct. Moreover, she has not established that she believed Kouidri had the authority to affect the terms and conditions of employment, or that if she so believed, such a belief was reasonable. Therefore, the doctrine of apparent authority cannot result in the imposition of strict liability against Celadon.

## 2. *The Doctrine of Apparent Authority*

■ An employee may be deemed to be a supervisor under the doctrine of apparent authority. Thus, as the Supreme Court recognized in *Ellerth,* the "[s]cope of employment does not define the only basis for employer liability under agency principles. In limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment. The princi-

ples are set forth in the much-cited § 219(2) of the Restatement" of the Law, Second, Agency, which provides, in relevant part, that the "master" may be liable where:

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Ellerth,* 524 U.S. at 758, 118 S.Ct. at 2267 (quoting Restatement (Second) of Agency § 219(2)(d)). "In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence . . . . If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one." *Id.* at 759, 118 S.Ct. at 2268 (citing Restatement (Second) of Agency § 8, Comment c).

In the instant case, the factual record does not support Newell's conclusion that she believed that Kouidri was her supervisor, with the type of authority sufficient to impose liability on Celadon for his behavior. Even if the record was sufficient, such a belief would not be reasonable. Therefore, as a matter of law, the facts presented by Newell do not support a finding of apparent authority.

## *Kouidri Did Not Represent Himself As A Supervisor*

The record is undisputed that Kouidri did not hold himself out as a supervisor. Newell testified that Kouidri had never indicated he was a supervisor. Moreover, he did not wear a suit—the type of clothing commonly worn by supervisors at Celadon. As the above-quoted section of the Restatement makes clear, the servant must have "purported to act or to speak on behalf of the principal." Restatement

(Second) of Agency § 219(2)(d). Similarly, the MCAD Guidelines, on which Newell relies, provide in relevant part as follows:

> The employer may be vicariously liable for sexual harassment even if the alleged harasser is not formally designated as a supervisor and even if a supervisor lacks actual authority, under the doctrine of apparent authority. Liability under these circumstances exists when the harasser *holds himself out to the employee as having supervisory authority over the employee.* The employee's belief *that the harasser has authority over her, to the extent that it is reasonable,* may be a significant factor in determining the existence of apparent authority.

*MCAD Guidelines* § IIIB (emphasis added; footnotes omitted). The plaintiff has cited no cases, and none have been found, where the alleged harasser took no steps to assert any authority over the terms and conditions of the victim's employment, yet the victim's mistaken belief was sufficient to impose vicarious liability on the part of the employer. *See and compare MCAD and Blue v. Aramark Corp.,* No. 98–BEM–1796, 2004 WL 1920884 (MCAD Aug. 20, 2004) (Decision of the Full Commission) (employee found to be a supervisor under doctrine of apparent authority where the employer directed the complainants' day-to-day activities, threatened to have the complainant fired, and took steps to carry out his threat); *Robinson v. Haffner's Serv. Stations, Inc.,* No. 97–BEM–3775, 2001 WL 1602780 (MCAD Oct. 29, 2001) (Hearing Officer Decision and Order) (apparent authority applies where company created the reasonable impression that employee was a supervisor by giving him a shirt with the title of station manager and listing him in the telephone directory as a

manager, among other things). Absent any recognition by Kouidri himself of his status as a "supervisor," Newell's mistaken belief as to his status is insufficient to establish liability on the part of Celadon.

### Newell's Perceptions

As a factual matter, Newell's conclusory assertion that she believed Kouidri was a supervisor is insufficient to establish that he had the type of authority necessary to impose liability on the part of the employer.

As detailed above, absent "some modicum" of authority to affect the terms and conditions of the victim's employment, such as "the power to hire, fire, demote, promote, transfer, or discipline an employee," "a harasser cannot qualify as a supervisor for purposes of imputing vicarious liability to the employer ... but, rather, should be regarded as an ordinary coworker." *Noviello,* 398 F.3d at 96. *See also EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* § IIIB (June 18, 1999) (there may be employer liability if employee reasonably believed that the harasser had actual authority over the employee "to significantly influence employment decisions affecting" the victim); *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994) (relied on by the plaintiff) ("where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers") (citations omitted) (*cited with approval in Johnson v. Plastic Packaging, Inc.,* 892 F.Supp. 25, 29 (D.Mass.1995)). *Accord Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305–06 (2d Cir. 1995).[7]

---

**7.** The plaintiff relies on *Karibian* and *Tomka* which also "hold that an employer is liable

In the instant case, there is no evidence that Newell believed Kouidri could significantly influence the terms and conditions of her employment or that Kouidri attempted to do so. According to the plaintiff, her immediate supervisor, who gave her work assignments, was Rodney Butler. Pl.Ex. A (Newell Aff.) ¶ 5. She describes Kouidri as "an employee of Celadon." *Id.* ¶ 6. On the date of the incident, another security guard asked Newell to accompany Kouidri on a tour. *Id.* Thus, Kouidri did not direct Newell in any way in connection with taking the tour of the building, much less purport to exert supervisory authority over her in connection with taking the tour.

Once in the basement, Kouidri allegedly exerted physical force against the plaintiff. *Id.* There is no evidence that he tried to exhort her to submit to his authority or otherwise threaten to affect the terms or conditions of employment.

While Newell claims that she believed Kouidri was a supervisor, there is no evidence that she believed he had the power to control her employment with Celadon. Thus, the totality of the relevant facts proffered by the plaintiff are as follows:

I believed that Kouidri was a supervisor at Celadon. Kouidri wore street clothes instead of a security uniform like the security guards wore. I had seen Kouidri once before at the same site. Kouidri wore street clothes then as well. My experience at Celadon was that supervisors did not wear security uniforms.

Kouidri acted like a supervisor on the earlier occasion. At that time, when I left my desk to get a soda, Kouidri yelled at me and ordered me to return to my desk. He told me that I was supposed to sit there and stay there. He was very pushy. He acted like a supervisor. He also walked around with a walkie-talkie. I was never given a walkie-talkie by Celadon.

*Id.* ¶¶ 7, 8. At most, Kouidri was pushy—there is nothing in the record that distinguishes his conduct towards her from an annoyed co-worker who felt his colleague was not attending to her responsibility. Newell does not assert that she believed that Kouidri could hire, fire or promote her, alter her job assignments or otherwise affect the terms and conditions of her employment. Nor is there any evidence that she went on the tour with Kouidri because of her mistaken belief as to his status. In fact, Newell testified that on an earlier occasion when Kouidri made a suggestion as to where she should sit, she disregarded the suggestion. *See* Def. Ex. B at 88–89. Obviously, she did not feel that Kouidri had the authority over her to even change the location of her seat, much less hire or fire her. The facts put forward by the plaintiff simply do not rise to the level of creating vicarious liability on the part of Celadon for the activities of an employee mistakenly believed to be a supervisor by a co-employee. Moreover, any mistaken belief by the employee would simply not be reasonable.[8]

### 3. *Celadon's Liability for Co-Employee Harassment*

As detailed above, under both federal and Massachusetts law, "an em-

---

for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian,* 14 F.3d at 780. This limitation on an employer's liability for a high-level supervi-

sor's conduct has been modified by *Faragher* and *Ellerth.*

8. In light of this court's conclusion that Kouidri did not qualify as a supervisor, it will not address whether Celadon is entitled to assert the *Faragher/Ellerth* defense.

ployer is liable for the sexual harassment perpetrated by an employee if it knew or should have known of the harassment, unless the employer can show it took appropriate steps to halt the harassment." *Messina,* 906 F.Supp. at 38. The undisputed facts establish that Celadon had no prior complaints about Kouidri or any information that would have led the company to believe that he would act inappropriately toward Newell or any other person. Under such circumstances, Newell has failed to establish Celadon's liability for the wrongful conduct of its employee. *See Noviello,* 398 F.3d at 96–97.

Moreover, to the extent that Celadon's response to the situation is relevant, it was "prompt and appropriate." *Messina,* 906 F.Supp. at 38. The response "must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Otero Vazquez v. Am. Home Prods. Corp.,* No. Civ. 01–2126(RLA), 2005 WL 2001299, at *10 (D.P.R. Aug.19, 2005) (quoting *Cerros v. Steel Techs., Inc.,* 398 F.3d 944, 953 (7th Cir.2005)) (additional citations and punctuation omitted). Here, Newell and Kouidri were separated and did not work together again. Regardless whether there was a full investigation, Kouidri did not return to work and he was deemed not eligible for rehire. That was sufficient.

## C. *Newell's Claim of Retaliation*

Newell contends that Celadon retaliated against her for complaining about Kouidri's behavior. Thus, she complains that she "was transferred by Celadon to a less advantageous assignment with lower pay. Celadon, despite its denial, failed to provide Plaintiff with an operable telephone at the site. In addition, Celadon left Plaintiff stranded at that remote site on her last date of work." Pl. Opp. (Docket No. 32) at

18. Because Newell has failed to establish that she suffered an adverse job action or that the transfer was wrongfully motivated, summary judgment must be entered in favor of Celadon.

█ Retaliation for engaging in a protected activity such as complaining about sexual harassment is prohibited under both federal and state law. Thus, under Title VII:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). Mass. Gen. Laws ch. 151B, § 4(4) makes it unlawful for an employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint ...." In addition, Mass. Gen. Laws ch. 141B, § 4(4A) makes it unlawful "to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter ...." Under both state and federal law, "a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." *Noviello,* 398 F.3d at 88, and cases cited. Newell has failed to meet her burden of establishing these elements.

### 1. *Adverse Employment Action*

█ "Prohibited retaliatory actions are those that constitute a change in working conditions that 'create a material disadvantage in the plaintiff's employment.'" *Ritchie v. Dep't of State Police,* 60 Mass.

App.Ct. 655, 665, 805 N.E.2d 54, 63 (2004) (quoting *Flanagan–Uusitalo v. D.T. Indus., Inc.*, 190 F.Supp.2d 105, 116 (D.Mass. 2001)).[9] Adverse employment actions include, but are not limited to, "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir.1998), and cases cited. In each case, the action must have been motivated by a wrongful intent. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir.1991) (elements of retaliation claim include proof that the employer knew of the plaintiff's protected conduct, "and that the employer lashed out in consequence of it"), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

█ Here, Newell "has failed to offer facts indicating that [her] informal complaint caused any adverse actions." *Hernandez–Torres*, 158 F.3d at 47. While she complains about Marina Bay being a less favorable locale, when she signed on as an employee of Celadon her conditions of employment specifically recognized the fact that she would be assigned to different locations. *See* Def. Ex. I. Newell had worked at Marina Bay before the incident, and it was a regular site for which Celadon provided security guards. To the extent that transportation home was a problem, Celadon provided her with transportation, and her contention that she was paid less at the Marina Bay site is simply not supported by the record. Moreover, even accepting as true Newell's claim that the phone did not work at Marina Bay, there is no evidence to support a conclusion that having an inoperable phone was intentional or that it was anything other than a short-term problem. It was clearly contrary to

the best interest of Celadon to tolerate a situation where its personnel, who were hired to provide security, did not have access to backup help in case of an emergency.

In short, Newell has failed to establish that the transfer to Marina Bay was an adverse employment action. It is well established that "a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir.2002), and cases cited. "[T]he evidence presented here showed—at most— that the transfer resulted in some minor, likely temporary, changes in [Newell's] working conditions." *Id.* at 24. *See also Otero Vazquez*, No. Civ. 01–2126(RLA), 2005 WL 2001299, at *13–14 and cases cited (where company had right to assign sales representatives to different territory, temporary reassignment so as to separate victim from alleged harasser not actionable). Since Newell failed to prove that Celadon "took any action against [her] at all which was substantial enough to count as the kind of material disadvantage that is a predicate for a finding of unlawful retaliation," her claim must fail. *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662, 672 N.E.2d 1, 7 (1996). Her claims "amount to no more than subjective feelings of disappointment and disillusionment. [She] offered *no objective evidence that* [she] had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment." *Id.* at 663, 672 N.E.2d at 8.

█ Newell's claim must fail for the additional reason that she has failed to establish "a causal link between the tangible employment action and the alleged harassment and harasser." *Otero*

---

**9.** "The threat itself is the adverse action for the purpose of the [Mass. Gen. Laws ch. 151B,] § 4(4A) action." *Ritchie*, 60 Mass. App.Ct. at 664 n. 16, 805 N.E.2d at 62 n. 16.

*Vazquez,* 2005 WL 2001299 at \*14 (quotations and citation omitted). There is simply nothing in the record to support a conclusion that the transfer was in any way intended to punish Newell. Rather, serving at different locales was a regular part of her job and the Marina Bay location was regularly served by Celadon.

### 2. *Retaliatory Hostile Environment*

 Newell's claim that Celadon failed to pick her up on Friday night after work does not alter this court's conclusion that the record is insufficient to establish retaliation. Reading the record in the light most favorable to Newell, the company agreed to and did provide transportation to her for several nights. On Friday night, her lift did not come. The company's explanation that there was a misunderstanding as to when Newell's shift ended is logical and has not been refuted by the plaintiff. There is nothing in the record from which a jury could logically infer that Celadon anticipated that Newell would walk home if her ride did not appear. As Marina Bay is a residential complex, not a deserted warehouse, there were other phones around, even if they were not convenient. To the extent that Newell claims that she was intentionally stranded, her conclusion is based solely on "improbable inferences, and unsupported speculation" which is insufficient to overcome a motion for summary judgment.[10] *Fennell,* 83 F.3d at 535.

 Even assuming Newell was intentionally stranded, the record does not support a conclusion that Newell was subjected to a retaliatory hostile work environment. An employer "will be liable for retaliation if it tolerates severe or pervasive harassment motivated by the plaintiff's protected conduct." *Marrero,* 304

F.3d at 26. Even assuming that Celadon intentionally failed to drive Newell home, this incident was not so "severe or pervasive that it alter[ed] the conditions of the plaintiff's employment." *Id.* While there are circumstances where one incident may be so severe as to create a hostile work environment, this is not such a situation. This one event, for which Celadon has offered a logical explanation, is insufficient to establish wrongful conduct or intent on the part of the defendant. *See id.* (in ruling that plaintiff's claim that she was subjected to a retaliatory hostile work environment failed when she quit three days after filing an EEOC charge, the court reasoned that "[a] few incidents over the course of three days cannot reasonably be deemed 'pervasive' retaliatory harassment").

This court does not doubt that Newell sincerely believes that Celadon acted for the purpose of causing her harm. However, her "subjective and intangible impressions" are insufficient to support a retaliation claim and cannot form the basis "for legal intervention in the often fraught and delicate domain of personnel relations." *Bain v. City of Springfield,* 424 Mass. 758, 766, 678 N.E.2d 155, 161 (1997).

### IV. *CONCLUSION*

The plaintiff has failed to establish that Celadon is liable for the wrongful conduct of its employee, Kouidri, and has failed to establish a claim of wrongful retaliation for her complaint about Kouidri. For all the reasons detailed herein, Celadon's motion for summary judgment (Docket No. 30) is ALLOWED.

---

**10.** The fact that the company failed to pick Newell up also does not establish coercion, intimidation, threats or wrongful interference so as to impose liability under Mass. Gen. Laws ch. 151B, § 4(4A).